# CASES ARGUED AND DETERMINED

IN

# THE SUPREME COURT,

## OCTOBER TERM, 1856.

### NOBILI *v.* REDMAN.

The missions established in California prior to its acquisition by the United States, were political establishments, and in no manner connected with the church.

The fact that monks or priests were at the head of those institutions, proves nothing in favor of the claim of the Church to universal ownership.

The lands settled by the missions were not conveyed to any one, but remained the property of the Government; and even the church buildings thereon did not not become the property of the church corporate, until the decree of secularization of 1833.

The Catholic Church can only claim any of the mission property under the decree of secularization, and subject to its limitations.

APPEAL from the District Court of the Third Judicial District, County of Santa Clara.

The complaint sets forth that the plaintiff is the duly constituted Roman Catholic priest and pastor of the Mission and Church of Santa Clara, and that under the rules and discipline of the Roman Catholic Church, he has the administration of the temporalities of the said church and mission, and is entitled to the possession of its real and personal estate; that the defendant has unlawfully entered upon and taken possession of a certain tract of land in said county, belonging to said church, known as the orchard belonging to the former Mission of Santa Clara, and now the property of said church, for the recovery whereof plaintiff brings suit. The only question in this case, is the right of the Roman Catholic Church to the mission lands in this State.

The plaintiff on the trial, put in evidence the decree of Micheltorena, of March, 1843, restoring the Mission of Santa Clara and other missions

" to the very reverend padres whom the respective prelate may appoint to each of them," and providing that " said missions shall in future continue to be administered by the very reverend padres as tutors of the Indians, in the same manner as they held them formerly."    Plaintiff also proved the occupation of the premises in dispute by the mission priests, as a part of the mission lands, down to a period subsequent to the acquisition of California by the United States ; also the bull of Pope Pius IX, appointing the Rev. J. S. Alemany Bishop of Monterey, a diocese then comprehending all of Upper California ; also another bull, dividing the diocese and appointing him Archbishop of San Francisco, a diocese including all of this State north of a line running south of San Jose ; also the appointment of the plaintiff by the bishop as parish priest of Santa Clara ; and that under the canons, rules, and discipline of the Roman Catholic Church, the parish priest has the control and immediate possession of the property of the church of the parish.    The plaintiff also proved that the Rev. J. S. Alemany was the successor of the former bishops of Monterey, who held that office while the country was under the Mexican rule.    The canons of the Church referred to in appellant's brief were also proved, and also the fact that the defendant was in possession of the land at the time of commencing this action.

A judgment of non-suit was granted in the Court below, on motion of defendant.    Plaintiff appealed.

*A. P. Crittenden* for Appellant.

1. The plaintiff has shown a good title in the Church.

Under the Spanish monarchy, the Roman Catholic Church, and each religious order, and each cathedral or parish church, was capable of taking by any title and holding property.    It could acquire property in any of the modes in which an individual could acquire it, and property once appropriated or dedicated to the use of the Church, the maintenance of divine worship, or the support of the ministry, was designated sacred or ecclesiastical property, and certain restraints were imposed upon its alienation.

The privileges and immunities of the Church shall not be violated, nor their property occupied.    Novissima Recopilacion, Lib. 1, Tit. 2, Law 2.    Things legitimately given to the churches should be always kept in them.    Ib., Lib. 1, Tit. 5, Law 1.    Manner in which the Prelates are to receive the property of their churches and monastries, and prohibition to alienate its augmentation.    Ib., Lib. 1, Tit. 5, Law 2. Prohibition to buy and receive as pledge the chalices, books, crosses, and other ornaments of the churches.    Ib., Lib. 1, Tit. 5, Law 3. Conservation of the treasures, relics, images, and ornaments of churches. Ib., Law 4.    Ib., Law 5.    Let the property of churches, monastries, and ecclesiastical persons not be taken nor forcibly siezed upon.    Ib., Law 6.    The landed property which, on being alienated, passes to mortmain, or to persons exempt from the royal jurisdiction, must pay to his Majesty the fifth part of its value.    Ib., Lib. 1, Tit. 5, Law 12. Execution and fulfillment, preservation and defence of what has been

ordained in the Holy Council of Trent. (Philip II, in Madrid, by Royal Letters Patent, of 12th July, 1564,) Ib., Lib. 1, Tit. 1, Law 13. Directions for the fulfillment of what had been inserted in the Eighth Article of the Concordat of 1737, about the contribution of property acquired by ecclesiastics and in mortmain. Ib., Lib. 1, Tit. 5, Law. 14. New directions for the observance of the Eighth Article of the Concordat of 1737, about the contribution of property belonging to ecclesiastics or mortmain. Ib., Lib. 1, Tit. 5, Law. 15. Form of charging the property of mortmain. Ib., Lib. 1, Tit. 5, Law 15. The councils and lords of towns shall make no ordinances against the clergy and churches, to make them pay taxes, etc. Ib., Lib. 1, Tit. 9, Law 1. Cases in which the clergy are exempt or not from taxes and imposts. Ib., Lib. 1, Tit. 9, Law 6. Escriche's Dic., 364," "Bienes Ecclesiasticos." Charles IV. in Saint Lawrence, by letters patent of the 15th October, 1805. Novissima Recopilacion, addition to first book, Law 1, following 22. Escriche's Dictionary, "Immunidad Ecclesiastica." "Of the property of churches and monasteries, and that it cannot be alienated." Pandectas Hispano-Mexicanas, Partida 1, Tit. 14, No. 292. What it is to alienate, and for what reasons can the property of the church be alienated. Ib., No. 293, Law 1. Concerning the preservation and alienation of the things of the Church. Pandectas Hispano-Mexicanas, No. 321, p. 155, Council III of Mexico, Tit. 8, Lib. 3. Penalties are imposed upon those who usurp the property of any church or pious institution. Ib., Lib. I, 320, Council of Trent, Sess. 22, Chap. 11. Instituciones de Derecho Real de Castilla y de Indias, by Jose Ma. Alvarez, 2 Vol., pp. 2, 3, 4. Ib., Vol. 2, p. 116, Ib., Vol. 2, p. 117. Ferraris Bibliotheca Canonica, word "Alienare, Articulo Primo," No. 1. Ib., No. 2. Ib., No. 3. Just reasons for which the property of the Church may be alienated. Ib., Art. 2. Ib., Bona Ecclesiastica, Art. 1, No. 43. The modes by which the Church acquires property. Ib., No. 48. Ib., Nos. 53, 54, 55, 56, 57. Ib., Art. 2, Nos. 1, 2, 3, 4, 11. Fricslieben, Dec., Part 2, Caus. 12, Quest. 2, Can. 3. Ib., Canon 4. Ib., 7th Book of the Decretals, Book 1, Tit. 7, Chap. 1. Devoti Institutions of Canon Law, Vol. 1, Book 2, Tit. 13. Ib., Tit. 19.

The canon law was, in Spain and in all the Spanish colonies, a part of the law of the land, not only as regarded the government and discipline of the Church, but also as regarded the acquisition, enjoyment and transmission of property by the Church and by religious communities. See Sala Mexicana, Vol. 1, pp. 175 to 214, and citations above as to the decrees of the Council of Trent and their adoption and enforcement throughout the Spanish dominions. Recopilacion de leyes de las Indias, Lib. 1, Tit. 6, Law 49.

As the patronage and presentation, etc., Philip IV, in Madrid, 6th Nov., 1655. Ib., 7th Feb., 1616, Lib. 1, Tit. 7, Law 4. Philip II, in Madrid, 5th Nov., 1578, Tit. 7, Law 6. That the Councils of Lima and Mexico which lastly were held in the Provinces of Peru and

New Spain, be observed in what concerns each of them.   Philip III, in Madrid, 9th Feb., 1621, Tit. 8, Law 7.

The former laws of California are not foreign laws.   To the extent therefore in which the canon law was formerly recognized by the civil power and thereby made part of the municipal law, the Court will take judicial notice of it.   In the case of Fremont v. the United States, (17 How. R., 357,) the Supreme Court say : "It is proper to remark, that the laws of these territories under which titles were claimed, were never treated by the Court as foreign laws to be decided as a question of fact. It was always held that the Court was bound judicially to notice them, as much so as the laws of a State of the Union."

The missions were founded under the authority of the kings of Spain. From all the circumstances attending their establishment and the erection and endowment of the mission churches, it is manifest that the assent of the crown was given to the appropriation to religious uses of so much of the royal domain as was required for the churches, cemeteries, habitations of the clergy, and the gardens, orchards and vineyards required for the support of the ministry and the maintenance of divine worship.   The Church was an object of peculiar care to the government, which, by constant and minute legislation, regulated everything connected with it ; the observance and propogation of its faith and doctrines ; the enforcement of its discipline ; the founding and support of churches and other religious and charitable institutions wherever required ; the maintenance of its ministers and the preservation and due administration of its property and of the property of its different orders and associations.   It is absurd to suppose that under the eye of so vigilant a government, a church should have been established and existed any length of time without its sanction and authority, especially when it is considered that immediately upon the founding of any church, notice thereof was required to be given to the government.   Its foundation, therefore, in the absence of any proof of disapproval or prohibition, must be presumed to have been the act of the Government itself, and the land appropriated to the uses of the Church and possessed by it, must be presumed to have been appropriated and formally dedicated by the crown to religious uses.

The law upon this subject, not already cited, may be found in the "Recopilacion de leyes de Indias," Book 1.   Ib., Tit. 2, Laws 1 to 9. That monasteries for men and women be built with the previous permission of the King.   Ib., Tit. 3, Law 1, Philip II in Madrid, 19th March, 1591, and 11th June, 1594.   Philip III, ib., 5th Dec., 1608 ; in Lisbon, 24th Aug., 1619.   Philip IV, Madrid, last of Dec., 1635, and 18th Sept., 1653.   That no more places be taken for monasteries than those which can be peopled, and not being peopled within the fixed terms, let them be given to another religious order.   Philip II and the Princess G. in Valladolid, 18th Aug., 1556, Law 2.

Such a dedication once made could not be revoked.   The property thenceforth became ecclesiastical property ; was "withdrawn from com-

merce " and the title was vested in the Church, and could not be resumed even by the king.

The Supreme Court of the United States, in the case of New Orleans v. the United States, (10 Pet. R., 726,) in speaking of a dedication to public use, which in this respect stands in the same position as a dedication to religious uses, say : " No law was cited in the argument which showed the power of the king of Spain to alienate land which had been dedicated to the public use; and it is clear that the exercise of such a power would have violated the public law, which is understood to have limited the exercise of the sovereign power in this respect."

Pandectas Hispano-Mexicanas, Vol. 1, p. 149, No. 312.

The separation of Mexico from Spain could not divest this title.

" It has been asserted, as a principle of the common law, that the division of an empire creates no forfeiture of previously vested rights of property." Kelly v. Harrison, 2 John. C., 29 ; Jackson v. Lunn, 3 John. C., 109 ; Calvin's case, 7 Co., 27. And this principle is equally consonant with the common sense of mankind, and the maxims of eternal justice. Terrett and others v. Taylor and others, 9 Cr. R., 43.

The Mexican Government never attempted to divest the title of the Church. On the contrary, that Government maintained the Roman Catholic religion as the religion of the nation ; continued the church establishment in existence as it was under the former government ; recognized the rights of the church and of religious communities to their property, and protected and defended them in its possession and enjoyment.

Ordinance of Nov. 19, 1821, 1 Colleccion de Decretos. Constitutive Act of the Federation, 31 Jan., 1834, 3 Col. de Dec., 18. Constitution of Mexico, Oct. 4, 1824, Col. 3, de Decretos, 78. Bando, Nov. 20, 1833, Recop. de Leyes, 280. Circular of the Minister of Justice, Recopilacion de Leyes, 365, Dec. 24, 1833, containing the law of this date. Communities and ecclesiastical corporations are declared " free from impediment " (expeditas) in the legal use of their properties. Law of May 25, 1835, Recop. de Leyes, 206. Circular of Aug. 4, 1838, Recop. de Leyes, 298, regulates the sale of the property of religious communities. Law of 23d May, 1837, Art. 92. Law of Sept. 19, 1836, Recop. de Leyes, 107.

The secularization law of August 17, 1833, did not authorize an appropriation of the churches, vineyards, orchards, etc., to other purposes than those to whom they had been originally dedicated. But if such had been the intention of the law, it could only have been carried into effect as an appropriation of private property for public uses, and upon making just compensation. The law provides for compensation being made for property taken under its provisions, and by so doing recognizes it as private property. But that compensation was not fixed in the mode prescribed by the constitution, and the law was inoperative and void.

Whatever may have been its intention, its execution was suspended by the decree of Nov. 7, 1835, and was never lawfully carried into

effect.   See Secularization Law, and decree suspending it.   1 Rock. Span. and Mex. law, pp. 455, 462.

Constitution of 1824, Sec. 4, Art. 112, Par. 3, 3 Col. de Decretos, 96.   First Constitutional Law, 30th Dec., 1836, on the same subject.

In the year 1840, after the suspension of the secularization law, a petition was addressed to the Supreme Government of Mexico by Don Francisco Garcia Diego, Bishop of the Californias, in which he represented the condition of the Church in California, and asked that certain measures might be taken for its relief.   The decree of the Government, granting all that he asked, recognized the vineyards and orchards as the property of the Church, under the dedication to religious purposes.

Without proof of this decree as a fact, the Court will take judicial notice of the action of the Government of Mexico in a matter like this, of general concern.

The Mission of Santa Clara was founded at the expense of the King of Spain, in January, 1777, by Fr. Junipero Serra, President of the Missions ; the means of establishing it being furnished by the then Viceroy of New Spain.   The church was founded at the same time, and pastors assigned to it.   From that time to the date of the treaty of Guadalupe Hidalgo, the church building, the dwellings of the clergy, the orchards, etc., have been in the possession of the priests who have successively been the pastors of the Church of Santa Clara, with the exception of intervals between the years 1837 and 1843, during which they were unlawfully expelled from some portions of the property. Their expulsion being illegal, they were restored to the possession, the Government fully recognizing their rights.   See the petition of Bishop Garcia and the order of the Government thereon, of 17th Nov., 1840.

They were also maintained in their possession by the American authorities during the military occupation of the country.

Dedication by the owner to public, or charitable, or religious purposes, is recognized also by the common law as a mode of creating title to land.   No form or ceremony is requisite.   It may be by parol.   "All that is required is the assent of the owner and the fact of the land being used for the purposes intended by the appropriation."   McConnell *v.* Town of Lexington, 12 Wheat. R., 582 ; Town of Pawlet *v.* Clark *et als.*, 9 Cranch's R., 292 ; Beatty *v.* Kurtz, 2 Peters' R., 566 ; City of Cincinnati *v.* White, 6 Peters' R., 431 ; Barclay *v.* Howell, 6 Peters' R., 498 ; New Orleans *v.* The United States, 10 Peters' R., 662.

Rights of property acquired or held, under the law of Mexico, were not divested nor impaired by the change of government.   The laws, usages and customs of the governments of Spain and Mexico furnish the rule which is to govern in determining a question of title.   Terret *et als. v.* Taylor *et als.*, 9 Cranch's R., 43 ; Town of Pawlet *v.* Clark *et als.*, 9 Cranch's R., 292 ; Act of Congress to ascertain and settle Private Land Claims in California, Vol. 9, p. 631.

If the view which has been here taken of the law is correct, the Church has, by dedication and possession under it, a complete and perfect title to the property to recover which this suit is brought.

Further, the Church had title by prescription at the date of the Treaty of Guadalupe Hidalgo. It had then been in possession for seventy years. A possession of even forty years gave title, even as against the Government. Jones v. Borden, 5 Texas R., 410; Lewis v. San Antonio, 7 Texas R., 310, and authorities there cited.

From the year 1777, when the church was founded, to 1851, when the defendant entered, was a period of seventy-four years. In favor of a possession of such long continuance, a grant will be presumed. Jones v. Borden, 5 Texas R., 410, and cases cited; Hernden v. Casiano, 7 Texas R., 322; Paul v. Perez, 7 Texas R., 338; Lewis v. San Antonio, 7 Texas R., 302; Barclay et als. v. Howell's lessee, 6 Peters' R., 499.

Though it were held that the title remained in the King of Spain, and the use only was vested in the Church, it was a complete dedication. The title would have passed to Mexico and then to the United States, subject to the use. The dedication could not be revoked. New Orleans v. The United States, 10 Peters' R., 662; Lewis v. San Antonio, 7 Texas R., 321.

2. Without showing title in the Church the plaintiff can recover.

Possession is evidence of title, and proof of the possession of the plaintiff, or of those under whom he claims, prior to that of the defendant, is sufficient to enable the plaintiff to recover against a defendant who does not show title in himself. Plume v. Leonard et al., 4 Cal. R., 94; Hutchinson v. Perley, ib., 33; Hicks et al. v. Davis et al., ib., 67.

Though it were shown affirmatively that down to the date of the acquisition of California by the United States, the land in controversy had been occupied by the Church only by license or permission of the former governments, and the title had never vested in the Church, but had remained in those governments, by the change of sovereignty the title would have become vested in the United States, but the Church would still be entitled to the possession against all but the United States, or those having title derived from the United States. That license or permission of the former governments has never been revoked by the United States. On the contrary the authorities of the United States, have always maintained and supported the Church in its possession.

3. The action is properly brought in the name of the plaintiff as the representative of the Church.

Under the Canon Law the Bishop has the general control and management of the property of the Church within his diocese. Under the bishop the pastor or parish priest has the immediate possession and control of the property of the Church in the parish, or belonging to the particular church of which he is the pastor. Council of Trent, Sess. 24, Chap. 6, p. 365. Decree of National Council, p. 44. 4th Council of Baltimore, Decree 8. 7th Council of Baltimore, Decree 4, p. 278. National Council of 1842, Decree 15, p. 47. Devoti, Vol. 1, Tit. 31,

§ 17, p. 118.   Ib., Vol. 1, Tit. 3, § 10, p. 225.   Ib., Vol. 1, Tit. 14, pp. 670, 671, 672.

The State of California constituted the diocese of Monterey, until two or three years ago.   The Right Rev. Joseph S. Alemany was the bishop of that diocese.   In July, 1853, the State was divided into the arch-diocese of San Francisco and the diocese of Monterey, the dividing line between the two being the parallel of 37° 13′ north latitude. Bishop Alemany became the Archbishop of San Francisco, and continued to act also as Bishop of Monterey, no bishop having been appointed to that diocese until very recently.

In March, 1851, the plaintiff was appointed by Bishop Alemany the pastor of Santa Clara church and mission, and in September, 1854, the appointment was renewed and confirmed by the same person, who had, in the meantime, become the Archbishop of San Francisco.

Under the law of Spain and Mexico, the pastors of the Church were entitled to the aid of the proper tribunals in asserting the rights of the Church.   The right of administration and possession was in them, and that right was not divested by the change of government.   Citations above.

The land in controversy was in possession of successive priests, holding it for the church by virtue of their position as pastors of the Church of Santa Clara, down to a period subsequent to the acquisition of this country by the United States.   Each of these pastors held under the original and often recognized dedication to religious purposes.   The plaintiff is the legitimate and regular successor of those who have preceded him in the office of pastor.   He claims in the same right, and under the same dedication.

This case may be likened to one of dedication for a street or square of a town.   If the proprietor of land lays out a town upon it, marks streets and squares upon the plan, and sells lots by reference to them, and they are used for the purposes designated, it is a dedication of the land so marked, or its use, not merely to the first purchasers of the lots, but to all who may afterwards acquire them.   The right to the easement passes, by virtue of the ownership of the lots.   Though an interest in real estate, it is one which may, under our law, be created without writing, and will pass without writing and without assignment.

The only distinction which the common law makes between the two cases is that, in some respects, it favors more a dedication to pious or charitable purposes than one to mere public purposes.   The provisions of the common law, in regard to dedications to religious or charitable purposes, are probably derived from the civil law, and are exceedingly liberal.   "In aid of such dedications, and to effect the intention of the donor, a Court of Chancery will supply all defects in a disposition of lands, whether in the deed or will by which the disposition is made, in the party trusted with the use, in the parties who are to have the benefit of the use, or in the execution of the estate."   2 Story's Eq., Ch. 33, § § 1136 to 1194; Town of Pawlet v. Clark et al., 9 Cranch's R., 292.

The proper person to bring an action to enforce rights acquired by dedication to religious purposes, is the person who, under the organization and rules of the society in whose favor the dedication is made, is entitled to the administration of its property.    Town of Pawlet *v.* Clark *et al.*, 9 Cranch's R., 292 ; Beatty *v.* Kurtz, 2 Peters' R., 566 ; Smith *v.* Bonhoff, 2 Michigan Rep., Gibbs ; Terrett *et al. v.* Taylor *et al.*, 9 Cranch's R., 43.    Santillan *v.* Moses, 1 Cal. R., 92.

The statute law of California recognizes the rights of property of the Roman Catholic Church, in common with those of all other religious associations, and, of course, the possession by its ministers for its benefit, and their right to maintain and defend that possession in Courts of law.    Revised Stat., 308, 309, 310.

*Horace Hawes* for Respondent.

1. That the Church was originally incapable of acquiring, holding, or conveying landed property.

2. That subsequently, when this power to acquire and hold (not to alienate) wordly goods, so variant from the divine purposes of its establishment, was conferred upon the Church, it was under great restrictions, and could never be lawfully exercised without the express sanction of the sovereign power of the State to each acquisition.

3. That the modes by which the Church acquires property, or the titles and documents requisite to confer the right, are the same as those which are necessary in the case of individuals or other corporations, with the sovereign license superadded.

4. That unlike the case of individuals, however, the right of the Church to acquire property is not inherent, or of Divine origin, but is purely civil, created by the civil laws, and subject to the limitations which they may impose.

5. That although the Church, as a mystic body, restricted to the spiritual objects of its divine institution, exists independently of, and beyond the control of the State, yet considered as a corporation, and the possessor of temporal goods, it is a political community merely, a constituent part of the political organization of society, with only the rights of those of its class, and subject to all the changes and modifications that may be introduced.

6. That the acquisitions of the Church, like those of other political communities, and unlike those of corporations founded for commercial purposes, are never the property of its members in whole or in part, nor are destined to their individual benefit, but to fulfill the objects of public utility which the corporation is created to promote.

7. That the Church, therefore, considered under the aspect given to it in the preceding propositions, is, strictly speaking, the simple administrator of public property, placed under its charge for political ends, which, in case of a dissolution of its corporate or political existence, ordinarily returns to the general mass of public property, subject to any rights of reversion that may exist in favor of those who represent the donors.

22

8. That. although the Church may acquire property by private donation under the restrictions alluded to, and by express grant, from the sovereign or legislative power, of that which pertains to the dominion of the State, yet there never has existed any general license to make or accept such donations, nor any authority given to governors, territorial deputations, or other executive functionaries, to grant public lands to the Church—and no general or special power to make such grants was ever possessed by any authority in California.

9. That the *members* of religious orders, called the regular clergy, who alone were employed as missionaries in the Indies, are considered in law as civilly dead, ("dead to the world,") and incapable of acquiring and holding property by any title.

10. That the Missions were not corporations, but establishments founded by the Government for the advancement of population, civilization, and Christianity. The ecclesiastical power had no control over them, nor any possession of lands or other property appurtenant to them, nor was such possession in the padres or religious missionaries. The only possession distinct from that of the members of the community, was the possession of the Government; the Missions themselves, and the padres, the military escorts and *administradores* being mere instrumentalities and agents of the Government. Secularization consisted in removing the religious missionaries, and allowing the Church to appoint pastors of the secular clergy to admisister to the spiritual wants of the community, when the natives had been so far enlightened in the mysteries of the Catholic faith as to be fit subjects for the ordinary ecclesiastical government. This change had nothing to do with the rights of property. Cavallario, professor of civil and common law, in his "Institutes of Canon Law," book 4; Escriche Dic. de Leg., Tit. "Amortizacion Ecclesiastica;" Law 75 of the Fuero Viejo; L. 55, T. 6, P. 1; L. 4, T. 31, P. 1; L. 10, T. 2, P. 3; L. 2, T. 3, P. 6; L. 17, T. 1, P. 6; see the Ordenamiento of Medina del Campo of 1326, and the petition of twenty-three of the Cortes of Valladolid of 1345, and its response; De las Cosas Memorables de Espana, lib. 4; L. 12, T. 5, lib. 1, N. R.; note 3 to L. 12, T. 5, lib. 1, N. R.; L. 17, T. 5, lib. 1, N. R.; note 5, tit. 17, lib. 10, N. R.; L. 21, tit. 5, lib. 1, N. R.; L. 3, tit. 22, lib 7, N. R.

The Mexican law of colonization of 18th August, 1824, provides (Art. 13) that "the new settlers (pobladores) shall not have power to transfer their property in mortmain." (*manos muertas.*)

The decree of the Cortes of 4th January, 1813, provides (Art. 18) that the concessions of land made pursuant to articles 9, 10, 12, 13 and 15, shall be in full property, etc.; "but the owners of these allotments shall have no power to alienate them before the expiration of four years from the time of the concession, nor ever to subject them to entailment, nor to transfer them in mortmain, at any time nor by any title whatsoever."

In the decree of the Spanish Cortes of 27th September, 1820, reenacted in Spain, 30th August, 1836, it is ordained, that "the churches,

Nobili v. Redman.

monasteries, convents, and ecclesiastical communities of any kind whatsoever, as well secular as regular, hospitals, houses of refuge, houses of mercy and instruction, associations, fraternities, commandries, and other permanent establishments, be they ecclesiastical or laical, known by the name of *manos muertas*, shall henceforth have no power to acquire any real or immovable property in any province of the monarchy, neither by testament, nor by donation, purchase, exchange, forfeiture in enfiteutic rents, adjudication or mortgage, or in payment of arrears of rents, nor by any other title whatsoever, be the same lucrative or onerous." (Art. 15.)

Arguilles, in his " Diccionario de Hacienda," Art. *" ventas,"* indicates, with reference to the memorials of Ouvrard, printed in Paris in 1806, that in November, 1804, Pope Pius VII approved a royal *cedula*, signed by Charles IV, in which all the ecclesiastical property of Spain and the Indies was ordered to be sold. Escriche, see Sempere, Historia del Derecho, lib. 3, cap. III.

In confirmation of the opinion advanced by the learned jurist just cited, that the Partidas was not invested with the character of a legislative code, or if its doctrines have at length come to be regarded as just rules of decision where the authentic codes are silent, they can never have any other force than that of suppletory dispositions, it will only be necessary to refer to the fact that all accredited authors place it last in the scale of authority.

The following is the scale as given in the work entitled " Sala Mexicana," published in 1845, vol. 1, pp. 158, 159 :

1st grade. National [Mexican] laws subsequent to the Independence, including those of the States of the Confederation given while the federal system ruled, which are not opposed to the system adopted in the Constitution of 1836, nor have been abrogated by subsequent general laws.

2d. Spanish laws promulgated as well during the absolute as during the representative government, including the special ordinances of the different branches, with the *cedulas* and extraordinary Orders Communicate to America, the Recopilacion of the Indies, and Recopilacion of Castile, [*nueva,*] giving preference, among all these laws, to those of latest date.

3d. Ordenamiento Real.

4th. Ordenamiento de Alcala.

5th. Fuero Real.

6th. Fuero Juzgo.

7th. Siete Partidas.

All the provisions of the Popes and Councils, therefore, respecting the acquisition, control, or management of ecclesiastical property, which are subjects of temporal jurisdiction, are without force, unless they can be shown to have been recognized and adopted by the legislative power in Mexico. Hence the objection that was made to the testimony of the Vicar General, as to what the councils of the Church had decreed on these subjects. All papal bulls, briefs and rescripts, and decrees

of general councils, or other ecclesiastical provisions, even though they relate to subjects of faith and discipline, must be presented to and receive the *pase* of the Government before they can be promulgated, and if they are found to contain encroachments upon the prerogatives of the civil authority they will be interdicted.    It would be dangerous in the extreme to admit the right of the church to legislate about property in any way whatever.    See Const. of 1824, art. 50, 4 constl. law (of 1836) N. 17, attribution 24 ; Bases Organicas, art. 66, attribution 10, and art. 87, at. 18, 19 ; Spanish Const., (1812,) art. 171, at. 14, L. 1, 2 and 3, tit. 9, lib. 1, R. I.

Even the building of a church, the founding of a convent, or other religious establishment, the appointment of bishops, pastors, or dignitaries in the church, could not take place without a license or nomination of the civil power, which is called the sovereign right of patronage. This right always belonged to the Spanish crown, but is expressly recognized in the famous bull of Julius II.    See Parras " Gobierno de los Regulares de la America," v. 1, p. 4, n. 2–7, L. 1 and 2, tit. 3, L. 2 and 43, tit. 6, lib. 1, R. I.; " Instituciones del Derecho Publico General de Espana'" [Dou.,] p. 273, 286, 292–297, and the Spanish and Mexican Constitutions above cited, 2 Cavallario 162, 170–173 L., 1 tit., 15 lib., 1 B. I.

By a decree of the "Sovereign Constituent Congress" of Mexico, of 16th March, 1822, the "temporalities" of religious orders were directed to be sold, and the product applied to the maintenance of the troops. By another decree of the same Congress, of June 30, 1823, it is ordered, "that the estate of San Lorenzo, ancient possession of the Jesuits, shall be delivered over to the citizens of Chapalcingo, under a just and useful mode of distribution ;" that the recipients of the property should severally pay two and a half per cent. annually on the value of their respective shares, which should go, first, to discharge existing encumbrances, and the overplus into the public treasury.    By a decree of the same Congress, of 18th December, 1821, it was ordered, that the "temporalities" destined, by the founders, to the support of hospitals, and the friars who had been employed in their service and management, should be placed under the administration of the Ayuntamiento of the City of Mexico.    By another decree of the same Congress, of May 5th, 1823, it is ordered, that the real property of the extinguished Tribunal of the Inquisition, and of other extinguished communities, should be disposed of in small parcels.    On the 16th of the same month, the order is renewed, and extended to all "temporalities."    By the general law of 4th August, 1824, it is declared that the "temporalities" (of the extinguished orders and ex-Inquisition,) belong to the nation.    By a decree of the Mexican Congress of December 24, 1833, it is declared, as a principle, that no real property or capitals of *manos muertas* should have been, or can be occupied, sold, or alienated, without the resolution of the general Congress thereon.

The *Fonda piadosa de Californias* consisted of several valuable estates, urban and rural, situated in different parts of Mexico, originat-

ing in private donations and testamentary dispositions, the products of which were destined for the propagation of the Catholic faith in the Californias.   By a decree of the general Congress, of 25th May, 1832, the possession and administration of this "pious fund" was placed exclusively in the hands of the government, the products to be placed on deposit in the national mint.

Having clearly shown that, under the laws of Mexico, the Church could lay no claim to real property but what she had acquired by express title in some of the ordinary legal modes, with the sovereign permission, and that the policy and the presumptions of the law being against ecclesiastical amortization, any asserted title, on the part of the Church, or other *manos muertas*, must be established by the clearest proof; and having, as it is respectfully submitted, substantiated the first nine points proposed, the remaining authorities to be adduced will tend to illustrate and establish the several propositions embraced in the tenth, relating to the Missions.   The character of these establishments is exactly stated in the official report to the United States Government, made by Wm. Carey Jones, Esq., in 1849.

In the royal "Regulation for the Presidios of the Peninsula of California, erection of new Missions, promotion of population and extension of the establishments of Monterey," approved by the king October 24, 1781, will be found the most minute provisions relative to the missions then already founded, and others which were to be founded in Upper California, by consulting which, particularly Title XV, it will be seen that all the missions in this State were, in the strictest sense, government establishments, founded, regulated and governed, in the minutest details, by the civil power, and supported exclusively from the royal treasury.   So by reference to Palon's Life of Father Junipero, (p. 53–5, 63, 64, etc.,) we shall see that the missions erected prior to the date of that regulation, of which Santa Clara was one, established 12th January, 1777, were all founded under express royal orders, and wholly at the expense of the crown.

In the report of a special commission, appointed by the Mexican Government to present a plan for the regulation of the missions of the territories of Upper and Lower California, dated the 6th of April, 1825, the following extract is made:

"The Junta acknowledges that the great progress made by the missions established by the Jesuits in Old California, and by those established in the new by the *Fernandinos.* (or Franciscans,) is attributable to the Spanish system of discoveries and spiritual conquests, and is aware of the eulogiums that these establishments have merited, not only from the Spaniards, but from some enlightened foreigners.   *   *

"The state in which the present missions are found does not correspond to the great progress which they made in the beginning.   This decadence is very notable in those of Lower California, and would be enough to prove that the system needs variation and reforms.   But among these, in the opinion of the *junta*, that is indispensable which is demanded by the diversion which missionaries have suffered from

their essential ministry; occupying themselves with the temporalities of each mission, and with its administration and government, because, besides being prejudicial to their principal destination and object, (which was altogether political and temporal,) this cannot be done without a material relaxation of the vows which the sons of San Francisco have professed, and without being opposed to the spirit and letter of the Bull of Urban VIII, of the 22d February, 1633, which ordained that the missionary monks should abstain from everything that might have the odor of business, merchandise or traffic."

In the report of a committee of this same *Junta,* dated 13th May, 1827, respecting the regulations to be adopted for the government of the Californias, it is said:

"Even the order of government with which this delicious country began to be ruled, was original; the missionaries were at the same time the civil governors and spiritual fathers; they established the ascending sale of reductions, Missions and *Pueblos,* but in all of them they were the governors, and the superior of the missions under his bonnet reunited the civil authority, the ecclesiastical and the military; the troops which supported it being subject to his dispositions, so that it would have been nothing strange if the catastrophe should have been repeated which was experienced in Paraguay." Such was the position which the padres occupied in the missions, and such the possession which they held. They were the governors, and administrators of the temporalities committed to their charge, under the political system which was established by law. Their possession was that of the government. In the year 1844, Manuel Castanares was residing in the city of Mexico, in the capacity of deputy elected to the general congress for the Department of Upper California. Several of his speeches and communications addressed to the Supreme Government were published in Mexico. In a very elaborate communication which he presented to the government, treating of all the various topics which he regarded as most interesting to his department, dated 13th May, 1844, are found the following observations, treating of the missions:

"There can be no doubt that to these establishments that peninsula owes the beginning of its political existence; that the missions constituted its primitive government; that they have always been considered as united with the posterior forms of its administration, and that in any event the system which may be adopted with respect to the missions, will make a most essential part of that which may be established for the prosperity and advancement of that country. The greatest evil that could have been done to my department, was the alienation of the property pertaining to the piety fund *(fonda piadosa)* of the Californians by the provisional government. This fund by itself alone was a lever sufficient to give to that country a general impulse, without neglecting on this account the original object of its institution."

This *fonda piadosa,* it will be recollected, consisted of old landed estates, which had been actually cultivated, some of them more than a century, and been administered by the religious missionaries. Yet it

was thought to be in the power of the government to administer, control and alienate this property.

Again, in the same communication, under the head of "Mexican Colonization," the importance of promoting which he represents in most eloquent terms, he says : "I will give to your Excellency (the Minister of Relations) another indication of the funds which in part may be destined to this measure, which is the salvation of the national territory : All the temporalities (*temporalidades,*) of the missions are certain property which belong to them in common, and in which the missionaries and the religious orders upon which they are dependent have nothing more than the charge of their administration by commission from the Government."

Neither the Mexican nor Spanish Government ever hesitated to exercise its absolute control in the disposition of the mission lands, whether consisting in those which had been occupied merely for grazing, cultivated fields, gardens, orchards, or otherwise ; nor was it ever pretended that the Church or religious orders had any shadow of right to any portion of them, although it was sometimes doubted whether those which were actually occupied by the missions ought not to be considered as the property of the neophytes and Mexican settlers.   Hence in the general regulation on the subject of colonization, of November 21st, 1828, Art. 17, it is provided that "In those territories where there may be missions, the lands which these occupy shall not be colonized at present, and until it be resolved whether they ought to be considered as property of the *reducciones* (missions) of *Neophyte, Catechumens,* and *Mexican settlers.*"   This temporary suspense was removed by the Act of Congress, of 26th November, 1833, which provides that "the Government is empowered to take all the measures which may secure the colonization, and to carry into effect the secularization of the missions of Upper and Lower California, being authorized to this effect, to use in the manner most convenient the estates of *obras pias* (the piety fund) of said territories, in order to furnish resources to the commission and families who are now in this capital, with destination thereto."

The Act of Congress of 17th of August, 1833, for the secularization of the Missions of Upper and Lower California, although it does not recognize the religious missionaries or their order, much less the Church, as owning anything attached to the missions, very distinctly designates and limits, in articles four, five and seven, what the Government was authorized to—but which, so far as appears, it never did—assign to the newly erected parishes.

So, then, the very churches which had served the missions, the apartments annexed thereto, and the mission buildings, were all considered as subject to the disposition of the Government, and by its authority were to be given, some to the use of the parish, that is, to the Church, which now, for the first time, makes her appearance in these matters, and the rest to municipal uses, primary schools, and workshops.    But *nemo dat quod non habet.*

What, then, was the condition of the vineyards, orchards, and lands,

which had been cultivated by the common labor of the Indians? They remained at the disposition of the Government, as they always had been before. They were not assigned to the use of the curate, because his occupation was not agricultural, or horticultural, or the cultivation of vineyards. He was to be employed, not with the cares of business, but with the care of souls.

In the provisional regulations adopted by Figueroa, 9th August, 1834, for carrying into effect the law of Congress, it is ordered that the vineyards, orchards and corn-fields shall be cultivated by the Indians in common, which for the present remained undisposed of, till the resolution of the Supreme Government. (Rockwell's Sp. and Mex. Law, v. I, p. 458; Jones' Rep., 16.) It is unnecessary to notice specifically all the acts of the general and departmental governments, and of Congress, on this subject; the several regulations of Figueroa, of Alvarado, of Micheltorena, and Pio Pico, the more important of which will be found at length in Rockwell, 455–477, and referred to, substantially, in Jones' Report, 8–22, proving, beyond the slightest doubt, that neither the missionary fathers nor the Church ever had any claim to, or possession of, *any* of the lands of the missions, but that the former administered them, to use the very words of Castanares, above cited, "by a commission from the Government;" and, as Mr. Jones observes in his Report, p. 17, that "all the tracts of land pertinent to the missions, but not directly attached to the mission buildings, were (after the secularization) granted as any other lands of the territory, to the Mexican inhabitants and to colonists, for stock farms and tillage."

The Acts of the Departmental Government subsequent to Micheltorena's decree, among which may be referred to, decree of the Departmental Assembly of 28th May, 1845, which provides for renting some of the missions; Pio Pico's for the sale and renting of the missions; decree of Departmental Assembly of 3d April, 1846, (Rockwell, 271–376,) and another decree of the Departmental Assembly of 24th August, 1844, (which will be found in the archives,) passed on the recommendation of Micheltorena himself, providing for the sale, renting and hypothecation of the real estate and cultivated lands of all the missions, all show that these establishments, with their vineyards, orchards, gardens, buildings and appurtenances, were regarded as public property, and in no public Act will it be found that the Church, or religious orders, or the clergy, were recognized as having any right of property in anything appurtenant to them, and it is believed that no instance can be found in which any existing right of property was asserted on the part of the Church prior to the American occupation.

On reference to the decree of 24th August, 1844, in the records of the Sessions of that period, it will be found to be declared in the report of the committee, which was as is stated, approved with absolute unanimity, that the missions are the property of the nation, and the Government is empowered to offer for sale, mortgage or lease, all *fincas raices* (improved real estate) and *terrenos de labor* (cultivated lands) of the missions of Upper California, comprehended in the distance from San

Nobili *v.* Redman.

Diego to Sonoma, and dispose of the proceeds for the expenses of the war which was anticipated with the United States, paying first the debts of the missions in preference.  This excepts no orchards, vineyards or gardens, for these were the only improved real estate and cultivated lands that belonged to the missions, and comprehended all that was valuable on which money could be raised.

So by the decree of Pio Pico of the 28th October, 1845, it is ordered: "Article 1.  There will be sold in this capital, to the highest bidder, the Missions of San Rafael, Dolores, Soledad, San Miguel and La Purissima, which are abandoned by their neophytes."  [This decree was made after due proclamation, made as provided in that of May 28, 1845.]

"Article 14.  The renting of the Missions of San Diego, San Luis Rey, San Gabriel, San Antonio, Santa Clara and San Jose, will take place when the difficulties shall be got over which at present exist with respect to the debts of those establishments, and then the Government will inform the public, and all shall be done agreeably to these regulations."  The Departmental Assembly again, in a decree of 3d August, 1846, which as evidence of the light in which the subject was regarded, is just as valuable as if made prior to the raising of the American flag, re-affirm the decree of 28th May, 1845, and expressly recognize and sanction what the Governor had done on the subject.

Thus it will be seen that every act of Government from the earliest period, not excepting the decree of Micheltorena and the alleged order of Bustamente's government, of 17th November, 1840, and the uniform acquiescence of the clergy, go to confirm and establish beyond any room for cavil, that the. mission lands of every kind, improved and unimproved, gardens, orchards and vineyards, and the buildings too, were the property of the nation, subject to be administered, rented, sold, distributed to settlers, or otherwise disposed of by the Government, in conformity with the laws; and moreover, that the padres, or the secular clergy, or the Church, not only never had, nor ever claimed to have, any property in them, but that they never had any possession of them, nor of anything pertaining to them ; or, to express this conclusion still more clearly, in the very words of Castanares, which are only a reiteration of those of the learned Junta before cited, that "the missionaries or the religious orders upon which they depend, had nothing more than the charge of their administration by commission from the Government." [See Collection of his Official Documents, p. 35.]

The opinion of the Court was delivered by Mr. Justice HEYDENFELDT.  Mr. Chief Justice MURRAY concurred.

The plaintiff, who is the pastor of the Catholic church in Santa Clara, sues for the possession of a piece of land known as the "Orchard," which belonged to the former Mission of Santa Clara; claiming that the mission lands were church property, and that by the rules of the Church, he is the administrator of the temporalities of that particular church and mission.

Much discussion has taken place upon the questions of the right of

the Church, under the Spanish and Mexican systems, to take property, and the right of the plaintiff to succeed; but the opinion to which I have arrived, renders it unnecessary to consider them.

According to all the Spanish and Mexican authorities, (which have been well collated in the respondent's argument,) the missions were political establishments, and in no manner connected with the Church. The fact that monks or priests were at the head of these institutions, proves nothing in favor of the claim of the Church to universal ownership of the property. It is here unnecessary to determine in what manner, or by what form of conveyance, the Church, as a political or corporate body, could validly acquire title. It is sufficient that there must have been some mode, so as to take the right out of the Government, or individual, and vest it in the Church, and certainly nothing of the kind is here shown to have existed.

If it be relied on that a priest or monk had government and control of the mission, the answer is simply that they were the civil governors; and although they combined with the power of civil government the functions of spiritual fathers, this was only the more effectually to carry out one of the objects of those establishments, which was, to convert and Christianize the Indians. And it appears fully, from all the investigations made into the Spanish and Mexican polity in reference to missions, that neither the missions, nor the priests of the missions, were incorporated into the general body of the Church, nor were, in any respect, under the control or direction of its diocesan ecclesiastics, whose rule was absolute over all their inferiors. On the contrary, the mission establishments arose directly from the action and authority of the government of the country; laws and regulations were made for them by its legislative authority, without referring to, or consulting the authority of the Church; the lands settled by them were not conveyed to any one, neither to priest nor neophyte, but remained the property of the governments; and there is not a word in all the decrees and acts of the government, which would even show that the church building, devoted to worship alone, ever became the property of the church corporate, until the decree of secularization of 1833.

It is urged by appellant, that that decree was suspended by a subsequent one, and consequently was never applied to the missions of California. In that case, as the Church had no rights in the mission before the decree of 1833, it remains without any, because it was only by that decree, if at all, that any rights were given it; on the other hand, if it claims to take by virtue of that decree, the limitations contained in it would not entitle the Church to the property sued for in this action.

Our conclusion is, that the plaintiff has no rights to the property in question, and therefore the judgment of the Court below is affirmed.